24 So.3d 1181 (2009)
C.E.L., Petitioner,
v.
STATE of Florida, Respondent.
No. SC08-1898.
Supreme Court of Florida.
December 17, 2009.
*1182 James Marion Moorman, Public Defender, and Matthew D. Bernstein, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Petitioner.
Bill McCollum, Attorney General, Tallahassee, Florida, Robert J. Krauss, Chief Assistant Attorney General, Diana K. Bock and Jonathan P. Hurley, Assistant Attorneys General, Tampa, FL, for Respondent.
PER CURIAM.
C.E.L. seeks review of the decision of the Second District Court of Appeal in C.E.L. v. State, 995 So.2d 558 (Fla. 2d DCA 2008), on the ground that it expressly and directly conflicts with the decision of the Third District Court of Appeal in D.T.B. v. State, 892 So.2d 522 (Fla. 3d DCA 2004). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. The issue presented in this case is whether a juvenile's continued flight, within a high-crime area, in defiance of a police officer's verbal order to stop, constitutes the offense of resisting, obstructing, or opposing an officer without violence under section 843.02, Florida Statutes (2007). We conclude, based on the plain language of section 843.02, that the interpretation provided by the Second District's en banc opinion resolves the statutory question. This Court is obligated to apply the law as written by the Legislature and to follow the Fourth Amendment precedent laid out by the United States Supreme Court,[1] even if we question the wisdom of that precedent or the public policy behind the law.

FACTS AND PROCEDURAL BACKGROUND
C.E.L., a fifteen-year-old African-American male, was convicted of resisting a law enforcement officer without violence under section 843.02 after he ran from two approaching *1183 officers in a high-crime area and then failed to obey their verbal command to stop. At the time the police officers approached, C.E.L. was simply "standing. . . in the public area of an apartment complex." C.E.L., 995 So.2d at 563 (Altenbernd, J., concurring).[2] Patrolling the complex in response to a prior complaint regarding drugs and trespassing, the two officers first noticed C.E.L. standing with another teenaged companion and approached them. Upon seeing the officers, each wearing vests emblazoned with "Sheriff" over their plain clothes, C.E.L. "immediately turned around and took flight." Id. at 559 (majority opinion). The officers then ordered C.E.L. to stop, but he disregarded the order and continued to run. Although C.E.L. resisted the officers' verbal command, he was ultimately apprehended and arrested for obstruction pursuant to section 843.02.[3] At the adjudicatory hearing on the obstruction charge, C.E.L. moved for a judgment of dismissal on the ground that the State's evidence was insufficient, asserting that running, by itself, was not enough to support a charge of obstructing or opposing an officer. The circuit court denied the motion, found C.E.L. guilty of the offense, and adjudicated him delinquent.
On appeal to the Second District, C.E.L. argued that the circuit court's denial of his motion for judgment of dismissal was erroneous because he did not commit the crime of resisting without violence. Specifically, C.E.L. alleged that because the two officers lacked reasonable suspicion to detain him before he took flight, any action he took after flight could not constitute the offense of resisting without violence. The Second District agreed that the officers did not initially possess reasonable suspicion to detain C.E.L. before his initial flight from them. C.E.L., 995 So.2d at 562. However, relying on Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000),[4] the district court concluded, in an en banc opinion, that C.E.L.'s "unprovoked flight" from the officers in a "high-crime area" provided reasonable suspicion and that C.E.L.'s continued flight, in defiance of a lawful police order to stop, constituted sufficient facts upon which to base a conviction for the violation of resisting an officer without violence. The Second District explained that it had "previously recognized that flight in knowing defiance of a law enforcement officer's lawful order to stop constitutes an act of resisting, obstructing, or opposing an officer in the lawful execution of a legal duty." C.E.L., 995 So.2d at 561. The district court concluded that the evidence against C.E.L. was sufficient to sustain a conviction because "the police command to stop was issued in the lawful performance of a legal duty and C.E.L's knowing defiance of the command [after he took flight] was an act of resisting, obstructing, or opposing an officer." C.E.L., 995 So.2d at 562.
The Third District in D.T.B. reached the opposite conclusion under similar facts. *1184 There, the district court concluded that reasonable suspicion to detain an individual must arise before the flight begins in order for the flight to constitute the offense of resisting an officer without violence.

ANALYSIS
In resolving the conflict issue presented, we emphasize that C.E.L. does not contest the fact that his actions constituted "unprovoked flight" under Wardlow or the State's position that the apartment complex was known for drug activity in a "high-crime area." Further, there has been no suggestion that the officers' order to stop was unlawful or that C.E.L. did not act in knowing defiance of that order. In fact, he has conceded before this Court that "flight provided the deputies with reasonable suspicion to conduct an investigatory stop." Essentially, C.E.L. argues that the sole act of flight cannot be used as the basis for reasonable suspicion necessary to support a conviction for resisting arrest and that whether C.E.L. unlawfully resisted the police officers' order must be evaluated from the point at which he commenced running, before any lawful command to stop occurred. Thus, the issue in this case is whether there should be a specific rule of law interpreting section 843.02 to require that reasonable suspicion of criminal activity exist before an individual flees.
Applying the United States Supreme Court precedent in Wardlow and adhering to the plain language of section 843.02, we conclude that the plain language of section 843.02 does not support the distinction set forth by the Third District in D.T.B. that would require reasonable suspicion to arise before the flight begins. In reaching this conclusion, we first explain the reasoning of Wardlow and the elements of section 843.02. Next, we explore the divergent conclusions reached by the Second District in the instant case and the Third District in D.T.B. Finally, we explain why we are compelled to approve the reasoning of the Second District.

A. Wardlow

Because Wardlow changed the legal landscape for establishing reasonable suspicion, we begin with an analysis of the United States Supreme Court's decision. In Wardlow, the Supreme Court held that an individual's unprovoked, "headlong" flight from the police in a high-crime area can create sufficient reasonable suspicion to warrant an investigative Terry[5] stop. Wardlow, 528 U.S. at 124-25, 120 S.Ct. 673. The defendant in Wardlow fled immediately upon seeing a four-car caravan of police officers arrive in an area of Chicago known for heavy narcotics trafficking. Id. at 121, 120 S.Ct. 673. After observing the defendant holding an opaque bag, police officers pursued the defendant, stopped him, and then proceeded to search him for weapons. Id. at 122, 120 S.Ct. 673. When the search revealed that the defendant was carrying a handgun and five live rounds of ammunition, officers arrested him for violating an Illinois firearm statute for which he was subsequently convicted. Id. at 122, 126, 120 S.Ct. 673.
The defendant then challenged his conviction on the ground that the police lacked reasonable suspicion sufficient to justify an investigative stop pursuant to Terry. Wardlow, 528 U.S. at 124, 120 S.Ct. 673. In upholding his conviction, the Supreme Court explained that although *1185 "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support [an investigatory stop,]" that factor, in addition to the defendant's unprovoked, "[h]eadlong flight" upon noticing the police provided reasonable suspicion that the defendant was involved in criminal activity, and further investigation under Terry was justified. Wardlow, 528 U.S. at 124-25, 120 S.Ct. 673.
In elaborating on the defendant's actions, the Court emphasized that its decision was consistent with its prior decision in Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), holding that "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." Wardlow, 528 U.S. at 125, 120 S.Ct. 673 (citing Royer, 460 U.S. at 498, 103 S.Ct. 1319). Moreover, any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Id. (quoting Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). However, the Supreme Court viewed an individual's actions in fleeing from a police officer as "not a mere refusal to cooperate" or "going about one's business" but "just the opposite." Id.
In reaching the conclusion that flight from a police officer was more than a refusal to cooperate, the Court analogized to cases where it had recognized "nervous, evasive behavior" as a "pertinent factor in determining reasonable suspicion." Id. at 124, 120 S.Ct. 673. It then observed that "[h]eadlong flightwherever it occursis the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. Relying on these two concepts, the Court concluded that flight from police could be one relevant factor in determining reasonable suspicion. See id. at 125, 120 S.Ct. 673. The Supreme Court finally stated that if, upon further investigation, "the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way." Id. at 126, 120 S.Ct. 673. In other words, had the officers not found the defendant in possession of a firearm, he would have been free to leave. See id.
Whether or not the Supreme Court, in deciding Wardlow, considered that one possible effect would be to further criminalize otherwise innocent behavior is not for us to decide. Rather, we must decide whether the inevitable result of Wardlow leads to a conclusion in this case that unprovoked, continued flight, in a high-crime area, and in defiance of a police officer's verbal command to stop, gives rise to a criminal charge of resisting an officer, even if no other independent ground for detention or arrest exists.

B. The Elements of Section 834.02

Our analysis of whether C.E.L. committed a criminal offense of resisting without violence focuses on the plain language of section 843.02. See Koile v. State, 934 So.2d 1226, 1233 (Fla.2006) ("[T]his Court must first look to the plain language of the statute, and if the statute is ambiguous on its face, the Court can only then rely upon the rules of statutory construction in order to discern legislative intent."). Section 843.02 provides, in pertinent part, that "[w]hoever shall resist, obstruct, or oppose any officer ... in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree." Id. In other words, to support a conviction for obstruction without violence, the State must prove: (1) the officer was engaged in the lawful execution of a legal duty; and (2) *1186 the defendant's action, by his words, conduct, or a combination thereof, constituted obstruction or resistance of that lawful duty. See N.H. v. State, 890 So.2d 514, 516-17 (Fla. 3d DCA 2005); H.H. v. State, 775 So.2d 397, 398 (Fla. 4th DCA 2000); S.G.K. v. State, 657 So.2d 1246, 1247 (Fla. 1st DCA 1995).
To determine whether the State established the first element, whether the officer was engaged in a lawfully executed legal duty, the court must first look to the legal standard that governs his or her actions. See Tillman v. State, 934 So.2d 1263, 1271, 1274 (Fla.2006). After examining the applicable legal standard, the next inquiry is whether the officer complied with that legal standard at the point where the act of resistance occurred. See id. at 1271. Once the court determines that the officer was engaged in the lawful execution of a legal duty, the inquiry is whether a fact-finder could find that the defendant's actions constituted obstruction or resistance of that legal duty.
Turning to the legal standards implicated here, we note that as a general rule, flight, standing alone, is insufficient to form the basis of a resisting without violence charge. See Mosley v. State, 739 So.2d 672, 675 (Fla. 4th DCA 1999).[6] Therefore, the act of flight alone is not a criminal offense. To be guilty of unlawfully resisting an officer, an individual who flees must know of the officer's intent to detain him, and the officer must be justified in making the stop at the point when the command to stop is issued. See H.H., 775 So.2d at 398; see also V.L. v. State, 790 So.2d 1140 (Fla. 5th DCA 2001). A stop is justified when an officer observes facts giving rise to a reasonable and well-founded suspicion that criminal activity has occurred or is about to occur. See Davis v. State, 973 So.2d 1277, 1279 (Fla. 2d DCA 2008); see also Popple v. State, 626 So.2d 185, 186 (Fla.1993). In turn, whether an officer's well-founded suspicion is reasonable is determined by the totality of the circumstances that existed at the time of the investigatory stop and is based solely on facts known to the officer before the stop. See Travers v. State, 739 So.2d 1262, 1263 (Fla. 2d DCA 1999); McCloud v. State, 491 So.2d 1164, 1165 (Fla. 2d DCA 1986). If the facts support a conclusion that the officers had reasonable suspicion to detain an individual at the point when the individual is ordered to stop, the next inquiry is whether a fact-finder could find that the individual's acts constituted obstruction or resistance without violence of the officers' execution of their legal duty.

C. The Reasoning of the Second District in C.E.L.

Framing the issue as whether an exception should be made from the general rule that knowing defiance of a lawful order to stop constitutes a violation of section 843.02, the Second District concluded that no exception existed and affirmed C.E.L.'s adjudication. C.E.L., 995 So.2d at 561-62. The en banc decision, authored by then-Judge Canady, explained that the threshold for establishing a resisting without violence offense required the officer to be in "lawful execution" of a "legal duty," mandating application of "the legal standards governing the duty undertaken by the law enforcement officer at the point that an... act ... of resistance occurs." Id. at *1187 560 (quoting Tillman v. State, 934 So.2d 1263, 1271 (Fla.2006)).
In finding the officers' order to stop lawful, the Second District relied on the holding in Wardlow that a defendant's unprovoked flight upon noticing the police in a high-crime area is suggestive of wrongdoing and provides reasonable suspicion to justify an investigatory detention under Terry. C.E.L., 995 So.2d at 561-62. Although C.E.L. conceded that Wardlow provided the officers with reasonable suspicion after he took flight, he argued that section 843.02 required legal justification for detention to exist not only at the time of flight, but before he initially fled from police.
Receding from its prior precedent in J.D.H. v. State, 967 So.2d 1128 (Fla. 2d DCA 2007),[7] the Second District concluded that "an offense under section 843.02 is committed by a person fleeing the police who defies a lawful order to stop even if the justification for detaining that person does not exist before he initially flees from the police." C.E.L., 995 So.2d at 562. It was simply "of no consequence that the police lacked a justification for detaining C.E.L. before his initial flight from them.... Although the mere act of running from the police was not an offense under section 843.02, once a lawful command to stop had been issued by an officer, knowing defiance of that command was such an offense." Id.

D. The Reasoning of the Third District in D.T.B.

When faced with a factually similar situation, the Third District reached the opposite conclusion. See D.T.B., 892 So.2d at 523. In D.T.B., two police officers approached an apartment complex with the intent to conduct a consensual field interview with a juvenile, D.T.B. Id. While there, the officers saw D.T.B. standing by a tree where the officers had, on previous occasions, observed drug transactions. Id. On this occasion, however, the officers had not observed any of those types of transactions and did not suspect that any were taking place. Id. Moreover, the officers did not suspect that D.T.B. was involved in any criminal activity. Id. Yet when the officers pulled their marked police car into this area, D.T.B. fled. Id. The officers verbally commanded D.T.B. to stop, but he continued to run. Id. The officers caught D.T.B., arrested him, and subsequently charged him with obstructing without violence under section 843.02. Id. At trial, *1188 D.T.B. filed a motion for judgment of acquittal, asserting that Wardlow "did not mandate an adjudication in this case." Id. The trial court denied D.T.B.'s motion, found that D.T.B.'s flight satisfied the elements of the statute, and adjudicated him delinquent. Id.
In reversing the trial court's holding, the Third District found that "it was improper for flight to be used as the vehicle for charging D.T.B. with ... obstruction." Id. at 524. The court explained that when an individual flees from police in a high-crime area, Wardlow's holding only provides a justification for the police to conduct nothing more than a Terry stop, or a "minimal intrusion, simply allowing the officer to briefly investigate further." Id. (quoting Wardlow, 528 U.S. at 126, 120 S.Ct. 673). It did not, however, "criminalize running from the police" or "intend for flight to be used as a justification for arrest and subsequent prosecution." Id. Thus, if "the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go [on] his way." Id. (quoting Wardlow, 528 U.S. at 126, 120 S.Ct. 673). Because that was not done in D.T.B., the district court reasoned, D.T.B.'s motion for acquittal should have been granted. Id. The court reasoned that while Wardlow gave the officers reasonable suspicion to stop the defendant, it did not provide a basis for a conviction of obstruction without violence.[8]

E. Our Conclusion Approving the Second District's Opinion in C.E.L.

C.E.L. concedes that Wardlow provided the officers with reasonable suspicion to conduct an investigatory stop, but argues that reasonable suspicion must have existed before he took flight. With this concession, C.E.L. asks us to adopt a general rule that section 843.02 requires reasonable suspicion of criminal activity to exist before an individual flees, when officers first approach a suspect. In this case, the Second District declined to adopt such an interpretation of the statute. See C.E.L., 995 So.2d at 562. We agree with the Second District that the application of Wardlow to section 843.02 provides no basis for the interpretation that reasonable suspicion must arise before the flight begins.
The plain language of section 843.02 makes it a punishable offense for an individual to resist without violence an officer engaged in the lawful execution of a legal duty. We acknowledge that when flight is the act of resistance, an individual who flees must know of the officer's intent to detain him, and the officer must be justified in making the stop at the point when the act of resistance occurs. See Tillman, 934 So.2d at 1263; H.H., 775 So.2d at 398. In this case, however, C.E.L. does not argue that he was unaware of the officers' verbal command to stop or of their intent to detain him. For this reason, we must only resolve the question of whether the officers, at the moment they ordered C.E.L. to stop, were justified in doing so.
An obstruction without violence charge is supported if an individual obstructs an officer in the lawful performance of his or her legal duty. § 843.02, Fla. Stat. (2007). Under the statute's plain *1189 language, it is of no consequence whether the obstructing conduct is initiated before the officer has any legal duty to act. The essential inquiry should instead focus on whether the officer was lawfully executing a legal duty when the obstructing conduct occurred. As the Second District aptly stated, "[t]here is no reason that a person who knowingly defies an officer's lawful command to stop in such circumstances should be absolved from responsibility under section 843.02.... Under section 843.02, lawful police action based on Wardlow should not be treated differently than lawful police action based on other grounds." C.E.L., 995 So.2d at 563. Therefore, applying Wardlow's holding to the facts here, C.E.L.'s flight in a high-crime area created the reasonable suspicion sufficient to warrant a lawful investigative stop. C.E.L.'s continued flight in knowing defiance of the officer's lawful order to stop constituted the offense of obstructing without violence pursuant to section 843.02, and accordingly, we approve the Second District's holding in C.E.L.

CONCLUSION
The plain language of section 843.02 makes it an offense for any person to resist, without violence, a law enforcement officer when the officer is engaged in a lawfully executed legal duty. Under Wardlow, the moment C.E.L. took flight in a high-crime area, the officers were provided with reasonable suspicion to warrant an investigatory stop. Therefore, the officers were engaged in the lawful execution of a legal duty. Thus, C.E.L.'s continued flight in defiance of the officers' lawful command constituted the offense of resisting an officer without violence under section 843.02.
Based on the foregoing reasoning, we approve the Second District's holding in C.E.L. and disapprove of the Third District's opinion in D.T.B.
It is so ordered.
PARIENTE, LEWIS, POLSTON, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which LABARGA and PERRY, JJ., concur.
QUINCE, C.J., dissents with an opinion.
CANADY, J., recused.
PARIENTE, J., specially concurring.
I concur in the majority's approval of the Second District's opinion in C.E.L. I write separately to address both the public policy concerns raised by this case and to point out additional legal and factual arguments for future cases that are not foreclosed by the majority opinion. While I recognize that this Court is required to follow the plain meaning of the statute, and generally cannot substitute its view of the better public policy choice,[9] I find this case to be extremely troubling because of its undeniable effect of adversely impacting teenagers who live in neighborhoods considered by the police to be "high-crime areas." I strongly urge the Legislature to act to prevent the potential for disparate and unnecessary criminalization of otherwise innocent conduct that ultimately impacts those who live in "high-crime" areas differently than those who do not.

A. Concerns for Future Cases
Succinctly stated, the impact of Wardlow and its application to section 843.02 is *1190 to criminalize an act of resistance following flight that occurs in what is termed a "high-crime" neighborhood. The fact that empirical studies support a conclusion that certain juveniles and adults may be more distrustful of and more likely to flee from police, regardless of guilt, raises additional concerns for the adverse impact on minorities.
These concerns are compellingly laid out by the Second District in Judge Altenbernd's concurring opinion in C.E.L. and Justice Stevens' concurring-in-part and dissenting-in-part opinion in Wardlow. I share these concerns. In C.E.L., Judge Altenbernd argued that the combination of the Wardlow decision, section 843.02, and the inclinations of the typical teenage mind, "creates a recipe for police tactics that can only exacerbate racial and socio-economic tensions in the communities of this state." C.E.L., 995 So.2d at 563 (Altenbernd, J., concurring). After all, C.E.L. was in this "high-crime neighborhood" because it was his home and teenagers living in a different neighborhood "would have been free to run when they saw the deputies." Id. at 563-64. On this point, Judge Altenbernd emphasized that there were no signs warning individuals they were in "a region with reduced Fourth Amendment rights" and that the neighborhood had not been classified as a "high-crime area" by some objective statistical measurement but only by the subjective testimony of individual law enforcement officers. Id. at 564. Moreover, this case was particularly troubling because it involved a juvenile, who may have had an entirely innocent motivation to flee from police officers.[10] To explain further, Judge Altenbernd observed:
The fact that this case involves juveniles is significant to me. It is arguably suspicious if a thirty-five-year-old woman decides to run when she sees a police officer at 8:50 p.m. in her neighborhood. It is another matter when the runner is a juvenile, especially a juvenile from an ethnic minority in a neighborhood that is poor. The simple truth is that any good police officer with a year's experience can conduct herself in a manner that causes many typical teenagers to run under these circumstances. The experienced officer can order a teenager to stop in a manner that will not convince many teenagers to stop. In other words, a well-trained law enforcement officer has the ability to arrest many teenagers almost at will during the evening hours in a bad neighborhood.
Id. (emphasis added). Finally, Judge Altenbernd conveyed his apprehension regarding the future impact of C.E.L.; specifically, he "fear[ed] there [would be] consequences for our communities if we allow the sale of drugs in poor and ethnic minority neighborhoods to transform those neighborhoods into `high-crime neighborhoods' where the Bill of Rights means something less than what the original framers intended it to mean for all free people." Id.
In Wardlow, Justice Stevens conveyed similar concerns. He proposed that "[t]he question ... concerns the `degree of suspicion that attaches to' a person's flight-or, more precisely, what `commonsense conclusions' can be drawn respecting the motives behind that flight." Wardlow, 528 U.S. at 128, 120 S.Ct. 673 (Stevens, J., concurring in part and dissenting in part). Whereas Judge Altenbernd seemed troubled by C.E.L.'s impact on poor, minority teenagers, Justice Stevens reasoned that Wardlow's failure to consider other "innocent" *1191 and "understandable" motives for flight could predictably impact innocent minorities in general. Wardlow, 528 U.S. at 132, 120 S.Ct. 673 (Stevens, J., concurring in part and dissenting in part). Citing numerous empirical studies, he explained:
Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence. For such a person, unprovoked flight is neither "aberrant" nor "abnormal." ... [Furthermore,] the evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive or insufficient.
Id. at 132-34, 120 S.Ct. 673 (footnotes omitted). Considering these factors and "[g]iven the diversity and frequency of possible motivations for flight ... [t]he inference we can reasonably draw about the motivation for a person's flight ... will depend on a number of different circumstances." Id. at 129, 120 S.Ct. 673 (Stevens, J., concurring in part and dissenting in part).
The concerns expressed by Judge Altenbernd and Justice Stevens are founded on two premises. First, an individual's location within a high-crime area may be outside that individual's control, i.e., it could be the only place a person can afford to live. And second, an individual's motivation for flight may be entirely innocent.
As to the first consideration, Judge Altenbernd highlighted that in C.E.L.'s case, he was not in the high-crime area by choice, rather, "it was his home." See C.E.L., 995 So.2d at 563-64 (Altenbernd, J., concurring) ("This teenager lives with his mother about a mile from where he was arrested. In other words, he was in a `high-crime neighborhood' because it is his home."). Moreover, Judge Altenbernd highlighted how "high-crime areas" may be related to "poor and ethnic minority neighborhoods." See id. at 564 ("It is another matter when the runner is a juvenile, especially a juvenile from an ethnic minority in a neighborhood that is poor."). Relying on Judge Altenbernd's correlation, the unintended consequence of today's holding is its effect on poor and ethnic minority neighborhoods designated as "high-crime areas." Notably, if this occurred several miles away, in an area where crime or drug activity was perhaps not so prevalent, C.E.L. would have been free to do the "crime" for which he was charged and remain unscathed.
The second consideration is the disturbing conclusion reached in Wardlow that "headlong flight" in a "high-crime neighborhood" is an act of evasion giving rise to reasonable suspicion. See Wardlow, 528 U.S. at 124, 120 S.Ct. 673. However, it is possible that rather than an act of evasion, C.E.L.'s flight could have been legitimately based on some other reason, such as a well-founded fear of police, his age, or both. As Justice Stevens observed, minorities and those residing in high-crime areas may flee upon sight of police, not because of criminal activity, but because of a well-founded fear of police, rooted in a perceived mistreatment of minorities by the police. See id. at 132-33 nn. 7-10, 120 S.Ct. 673 (Stevens, J., concurring in part and dissenting in part).
As an article cited by Justice Stevens concludes, "Black leaders [have] complained that innocent people [are] picked up in the drug sweeps.... [And] [s]ome teenagers [are] so scared of the [police drug] task force that they run even if they *1192 weren't selling drugs." Id. at 133 n. 8, 120 S.Ct. 673 (emphasis added) (quoting Kotlowitz, Hidden Casualties: Drug War's Emphasis on Law Enforcement Takes a Toll on Police, Wall St. J., Jan. 11, 1991, at A2). Furthermore, additional research has indicated that "[y]oung minority males in particular are strongly motivated to avoid [the police]" and "strive to avoid running into the police, believing that such encounters are all too often the prelude to abuse." Malcolm D. Holmes & Brad W. Smith, Race and Police Brutality: Roots of an Urban Dilemma 94 (2008) (emphasis added).
The bottom line is that I would urge the Legislature to consider whether statutory revisions to section 843.02 are necessary in order to address what is clearly an unintended consequence of the statutory scheme.

B. Arguments That Are Not Foreclosed by This Opinion
Although the majority's conclusion is limited to the circumstances of this case, it is important to discuss several alternative arguments that are not foreclosed by the majority opinion. First, Wardlow does not establish a per se rule regarding the existence of reasonable suspicion; the existence of reasonable suspicion is judged by a totality of circumstances. Second, an individual prosecuted under section 843.02 can challenge whether his or her flight from police was "unprovoked" and "headlong." Lastly, that individual can challenge whether the area of his or her alleged violation was actually within a "high-crime area."

1. Wardlow Does Not Establish a Per Se Rule That Reasonable Suspicion Exists
The hallmarks of Wardlow's holding are twofold. First, a suspect must be present in a high-crime location. Wardlow, 528 U.S. at 124, 120 S.Ct. 673. And second, the suspect must engage in subsequent "unprovoked flight upon noticing the police." Id. Both factors, when present, may provide an officer with reasonable suspicion that a crime had been or was about to be committed, inviting the officer to perform a lawful investigative stop. See id. at 124-26, 120 S.Ct. 673. However, other factors may be present that would dictate a finding that reasonable suspicion does not exist.
In deciding Wardlow, the United States Supreme Court continued to adhere to the totality of circumstances standard to hold that those two factors, if present, add to the total circumstances that might arouse an officer's suspicion enough to justify a lawful investigatory stop. See Wardlow, 528 U.S. at 126, 120 S.Ct. 673. Thus, while unprovoked flight and a suspect's locale are relevant factors, they are not always indicative of a reasonable suspicion of criminal activity. Id. at 136, 120 S.Ct. 673 (Stevens, J., concurring in part and dissenting in part). Further, unprovoked flight may give rise to a reasonable suspicion of criminal activity, even when the flight does not take place in a high-crime area, depending on the remaining circumstances of the case.
In this case, the majority position does not foreclose future challenges to whether reasonable suspicion of criminal activity exists the moment an order to stop has been giveni.e., whether an officer's order to stop was even lawful.[11] In other words, *1193 consideration of other factors, with which this Court was not presented, could have influenced the totality of the circumstances analysis and ultimate conclusion of reasonable suspicion. In his concurring-in-part opinion in Wardlow, Justice Stevens explained that motivation for a person's flight depends on a variety of circumstances, including "[f]actors such as the time of day, the number of people in the area, the character of the neighborhood, whether the officer was in uniform, the way the runner was dressed, the direction and speed of the flight, and whether the person's behavior was otherwise unusual." Id. at 129-30, 120 S.Ct. 673. Therefore, other factors, when present, could affect whether a person's flight in a high-crime area provides reasonable suspicion to justify a Terry stop.

2. Defendant Can Challenge Whether There Was Unprovoked Headlong Flight
An individual prosecuted under section 843.02 can also challenge whether his actions constituted the type of "unprovoked" and "headlong" flight from police that Wardlow described. As the majority in the instant case noted, the Wardlow Court found that a defendant's sudden exodus upon noticing police in the area was unprovoked, headlong flight. See 528 U.S. at 124-25, 120 S.Ct. 673. Although the Court's description explains what unprovoked, headlong flight may suggest to an approaching officer, it provides no clear guidance on how to identify when such flight is either unprovoked, headlong, or both. Therefore, whether flight constitutes "the consummate act of evasion" is left for other courts to resolve, when that issue is properly raised. In this case, the State asserts that C.E.L.'s flight upon noticing the officers' approach was "unprovoked" and "headlong." C.E.L. does not challenge this classification and fails to distinguish this case from Wardlow, so that issue was not preserved for our review in this case.
However, whether an individual's flight from police fits within the Wardlow framework is an issue that may still be examined. In fact, several of Florida's district courts have considered such challenges. For example, in Lee v. State, 868 So.2d 577 (Fla. 4th DCA 2004), the Fourth District addressed whether there were sufficient facts to support a reasonable suspicion of criminal activity to warrant a lawful investigatory stop. Id. at 580. In Lee, police officers arrived at a street corner in an area known for illegal drug activity after responding to an anonymous phone tip. Id. Upon noticing the officers, the suspects on the street corner "dispersed" in different directions. Id. When officers noticed the defendant "quickly walking away from the area," they detained him and subsequently seized contraband that the defendant had dropped prior to his detainment. Id. at 579-80. The Fourth District found that the contraband was illegally seized because Wardlow was inapplicable for establishing reasonable suspicion. Lee, 868 So.2d at 582. "The factor missing in the instant case [was] that there [was] no evidence of flight and certainly no evidence of `headlong flight.'" Id. at 581-82. In fact, the most that could be said was that the defendant was "walking quickly," and "[t]here was no evidence presented that [the defendant] acted `nervous' or engaged in `evasive behavior.'" Id. at 582. And "although *1194 [the defendant] was in an area known for numerous arrests ..., he did not flee upon the arrival of law enforcement.... [H]e `dispersed' ... [or] `walked quickly.'" Id. at 582-83. Therefore, "[u]nder the totality of circumstances there [were] insufficient facts to support a reasonable suspicion that [the defendant] was engaged in criminal activity" and the investigatory stop was unlawful. Id. at 582.
When faced with a similar question, the Second District, in Cunningham v. State, 884 So.2d 1121 (Fla. 2d DCA 2004), held that because no evidence established that the defendant actually observed the police before flight, the trial court erred when it applied Wardlow to deny the defendant's motion to suppress. Id. at 1121-23. In Cunningham, a sheriff's deputy patrolling a residential area noticed a small group of people standing outside a parked car with illuminated brake lights. Id. at 1121-22. The area was not known for being a high-crime area, but a number of burglaries had recently occurred there. Id. at 1122. To investigate further, the deputy turned down the street, and from a distance of seventy-five to a hundred yards, "saw a person jump into the car and accelerate quickly." Id. Without knowing whether the car's passengers saw his approach, the deputy "activated his blue lights and stopped the car." Id. The defendant, a passenger in the car, was searched and arrested for possession of cocaine. In finding that a well-founded suspicion did not exist for a stop and search to occur, the Second District explained that "the facts surrounding [the defendant's] departure from the scene [did] not rise to the level of `headlong flight'" contemplated by Wardlow. Cunningham, 884 So.2d at 1122. "There was no evidence that [the defendant] or the driver actually observed the police before the car left the area, which in [the court's] view [was] a critical factor." Id. at 1122-23. Moreover, although the deputy "was in a marked vehicle, it [was] not clear whether the suspects could have identified it as such." Id. at 1123. Thus, the district court concluded that the trial court erred in applying Wardlow and reversed the denial of the defendant's motion to suppress. Id. at 1124.
As Lee and Cunningham indicate, future challenges may raise the point that a defendant failed to see the officer approach or that his actions in moving away from the officer did not constitute headlong and unprovoked flight.

3. Defendant Can Challenge Whether the Incident Occurred Within a "High Crime Area"
Finally, an individual can challenge whether the area where his or her alleged violation occurred was actually within a "high-crime area." In Wardlow, the United States Supreme Court held that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation ... [under] a Terry analysis." Wardlow, 528 U.S. at 124, 120 S.Ct. 673 (citing Adams v. Williams, 407 U.S. 143, 144, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). Applying that logic, the Court labeled the defendant's location on a public street in an area known by the Chicago Police Department for heavy narcotics trafficking as a "high-crime area." Id. However, Wardlow does not provide a uniform method by which to distinguish areas of "high crime" and areas of "low" or "no crime."[12] In this case, the State *1195 argued and submitted testimony to establish that the apartment complex where C.E.L. was detained was, in fact, a "high-crime area." The detaining officers were patrolling the neighborhood in response to a prior complaint regarding drugs and trespassing. On appeal, C.E.L. did not contest this designation, but Judge Altenbernd expressed concern that the classification lacked "objective statistical measurement" and was based solely on "the subjective testimony of individual law enforcement officers." C.E.L., 995 So.2d at 564 (Altenbernd, J., concurring).
Other district courts have also discussed the type of evidence the State must present to prove that flight did, in fact, occur in a high-crime area. For example, in Cunningham, the facts of which are set forth above, the Second District defined a "high-crime area" as one "being riddled with narcotics dealings and drug-related shootings." 884 So.2d at 1122. In Cunningham, the court ultimately concluded the neighborhood in which an investigative stop occurred was a "high-crime area" even though it was not known to have a high crime rate. Id. In reaching this conclusion, the Second District explained that "a number of burglaries had recently occurred there" and this "recent unlawful activity ... arguably was a pertinent factor justifying the deputy's increased suspicion." Id.
The Second District addressed this issue again in D.R. v. State, 941 So.2d 536 (Fla. 2d DCA 2006). In D.R., the police first saw the defendant, a juvenile, when she was walking in the middle of the street in an area without sidewalks. Id. at 537. When the defendant first noticed police officers driving alongside her, she began to run away. Id. The officers then chased the defendant on foot, calling out for her to stop and return to them, which she did. Id. At that point, one of the officers observed a baggie of marijuana in her mouth, and then demanded that she remove it. Id. Although both parties agreed that Wardlow controlled this situation, and that the defendant's flight was unprovoked, in the defendant's motion to suppress, she challenged the State's contention that it proved her flight occurred in a "high-crime area." Id.
Before reaching a conclusion, the Second District explained that "[o]n cross-examination, the officer provided no details regarding the number of arrests in the neighborhood ... [and] his knowledge of the area was unsupported by any facts shared with the court that would suggest that the suspect's unprovoked flight occurred in a high crime area." Id. at 538. Moreover, "there was no testimony about the `relevant characteristics' of the location that would determine `whether the circumstances [were] sufficiently suspicious to warrant further investigation.'" Id. (quoting Wardlow, 528 U.S. at 124, 120 S.Ct. 673). These factors led the Second District to hold that "the officer's out-of-date conclusion, unreinforced by specific, contemporary information, was legally insufficient to satisfy the Fourth Amendment." Id. (footnote omitted). Notably, the D.R. court stated that "[a]lthough arrest statistics or information provided by regular police departmental briefings might be sufficient, [it did] not decide the nature or type of evidence necessary to establish an area as a high crime area, as that issue [was] not before [the court]." Id. at 538 n. 2. Thus, D.R.'s holding was limited to its conclusion that "there was no competent *1196 evidence to prove this [high-crime area] requirement in this case." Id.
In this case, I agree with the majority that based on Wardlow and C.E.L.'s concession that reasonable suspicion existed at the time the officers ordered him to stop, the Second District properly affirmed C.E.L.'s adjudication under section 843.02. However, I remain troubled by the ultimate impact of this decision and stress that under a different factual scenario Wardlow may not apply and may not support a basis for a conviction for resisting without violence.
LABARGA and PERRY, JJ., concur.
QUINCE, C.J., dissenting.
While the result reached by the majority seems to be in keeping with a literal reading of the statute, I cannot agree because of the societal implications of such a literal reading. I acknowledge that the United States Supreme Court in Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), held that flight from the police in a high crime area gives the police the requisite reasonable suspicion to temporarily stop and detain a person who is fleeing. I also acknowledge that section 843.02, Florida Statutes (2007), seems to allow the police to charge a person with resisting an officer without violence when he or she continues to flee from the police after an order to stop. However, I cannot believe that we as a society have come to the point where we are willing to make criminals of people, especially our young people, based on where they live.
In the Wardlow opinion the Supreme Court gave the police the authority to stop a fleeing citizen, not necessarily a fleeing suspect, if that flight from the police takes place in a "high crime area." If an individual such as C.E.L. or you or I lives in an area that has not been designated by the police as a "high crime area," that person could run with impunity at the sight of the police, even if he was in fact in the process of committing a crime as long as the police have no reason to believe he was about to commit a crime. Yet given the same set of facts, persons living in a high crime area, including juveniles who have no choice but to live where their parents have a home, become criminals if they run upon the sight of a police officer. What has become of such concepts as equal protection, innocent until proven guilty, and due process? Like the Third District Court of Appeal in D.T.B. v. State, 892 So.2d 522 (Fla. 3d DCA 2004), I do not believe this is the scenario and end result envisioned by the Wardlow court.
The unintended consequences of criminalizing otherwise innocent conduct and people are clearly illustrated in the D.T.B. case. In that case the police wanted to conduct what is termed a "voluntary field interview" with D.T.B. The police acknowledged that these types of interviews are consensual encounters between the police and a citizen, i.e., an encounter where the citizen is free to refuse to speak to the police and can leave at any time. They also acknowledged that D.T.B. was merely standing by a tree, albeit the police had observed drug transactions by that tree in the past. However, on this occasion the police did not observe any drug transactions, and they did not suspect D.T.B. of being involved in any criminal activity. When the officers pulled up to the area, D.T.B. ran away. The police ordered D.T.B. to stop, he continued to run, and the police caught and arrested him. What happened to the consent portion of the consensual encounter that the police acknowledged was their reason for approaching D.T.B.?
From the facts of the case, it appears that nothing was found on D.T.B. and *1197 there was no development of any facts that led the police to believe that any crime had been or was about to be committed. Yet D.T.B. was charged with and adjudicated for obstructing/resisting an officer based solely on the fact that he ran when he saw the police. Except for the fact that the Third District reversed D.T.B.'s adjudication of delinquency, this young person, who had done nothing more than run from the sight of the police,[13] would have a criminal record.
The Third District made its determination that D.T.B. should not have been adjudicated for resisting or obstructing an officer on two factors. First, the court said that Wardlow did not criminalize running from the police. Instead, the Third District reasoned, the Wardlow court simply gave the police another investigative tool and the ability to detain a person for a brief Terry-type investigation when that person runs at the sight of the police. If the police gain no additional information which would lead to probable cause, then the person should be free to go. Second, the Third District opined that the police had no reasonable suspicion that D.T.B. was engaged in any criminal activity. In fact, the police said just the opposite. Thus, the district court found that the officers were not executing any legal duty at the time the juvenile D.T.B. fled. Additionally, the Third District cited a number of other district court cases, decided prior to Wardlow, which held that flight alone was insufficient to demonstrate resisting/obstruction. See, e.g., D.M. v. State, 681 So.2d 797 (Fla. 2d DCA 1996) (holding that passenger of stopped car who fled from police was not guilty of obstruction without violence); S.G.K. v. State, 657 So.2d 1246 (Fla. 1st DCA 1995) (concluding that juvenile's presence at scene of automobile accident followed by flight when police approached was insufficient to justify finding juvenile resisted arrest without violence); F.B. v. State, 605 So.2d 578 (Fla. 3d DCA 1992) (holding that juvenile's flight from the scene of an automobile theft when ordered by police officers to stop was insufficient to support resisting arrest without violence).
Under the majority's reasoning in this case, the fact that the police said "Stop" turns what was otherwise the free exercise of a citizen's right to not have an encounter with the police into a misdemeanor of the first degree, which carries with it a punishment of up to one year in prison. I do not believe that the Wardlow court contemplated such a draconian result.
I am especially concerned because many of the cases we see, like the case before us, involve juveniles, our young people who are our future leaders and voters and workers. I simply cannot condone actions that could result in a large number of young people having criminal records, records that will follow them into the future, because they were uncomfortable with the possibility of having an encounter with the police. I can understand to some extent the police charging a person with obstruction/resisting if in fact the detention that is authorized under Wardlow ripens into something beyond the reasonable suspicion caused by the flight. However, I cannot understand making criminal that which any other citizen would be allowed to do but for the fact that this person lives in a particular neighborhood. I agree with the following statements from Judge Altenbernd's *1198 concurring opinion in C.E.L., 995 So.2d 558:
The fact that this case involves juveniles is significant to me. It is arguably suspicious if a thirty-five-year-old woman decides to run when she sees a police officer at 8:50 p.m. in her neighborhood. It is another matter when the runner is a juvenile, especially a juvenile from an ethnic minority in a neighborhood that is poor. The simple truth is that any good police officer with a year's experience can conduct herself in a manner that causes many typical teenagers to run under these circumstances. The experienced officer can order a teenager to stop in a manner that will not convince many teenagers to stop. In other words, a well-trained law enforcement officer has the ability to arrest many teenagers almost at will during the evening hours in a bad neighborhood.
... I fear there are consequences for our communities if we allow the sale of drugs in poor and ethnic neighborhoods to transform those neighborhoods into "high-crime neighborhoods" where the Bill of Rights means something less than what the original framers intended it to mean for all free people.
Id. at 564 (Altenbernd, J., concurring). And even in situations that involve adults, I have some cause for concern because many adults in these neighborhoods have had less than pleasant encounters with the police.
I urge the Legislature to address this very troubling and dangerous matter. This can be done by making clear that resisting or obstructing an officer must be based on factors other than mere flight from police. We simply cannot allow a generation of young people to be further victimized because of their often justifiable distrust of law enforcement and because they are unfortunate enough to live in a so-called "high-crime neighborhood."
NOTES
[1] See art. V, § 12, Fla. Const.
[2] The apartment complex is located in a neighborhood that "is sometimes referred to as a `suitcase city' and is locally regarded by law enforcement as a `high-crime neighborhood.'" C.E.L., 995 So.2d at 563 (Altenbernd, J., concurring).
[3] After C.E.L. was apprehended and arrested on the obstruction charge, the officers also determined that he had an outstanding arrest warrant. However, the officers' discovery of the existence of the outstanding arrest warrant after he was stopped has no effect on our analysis of the section 843.02 violation.
[4] In Wardlow, the United States Supreme Court held that a defendant's "unprovoked flight upon noticing the police" in a high-crime area was suggestive of wrongdoing and therefore provided reasonable suspicion justifying an investigatory detention. See Wardlow, 528 U.S. at 124-26, 120 S.Ct. 673.
[5] Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding that absent probable cause to arrest, a police officer may approach an individual to conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal conduct is afoot).
[6] This is entirely consistent with Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), where the United States Supreme Court held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. Id. at 498, 103 S.Ct. 1319; see also Wardlow, 528 U.S. at 125, 120 S.Ct. 673.
[7] In J.D.H., the Second District recognized that "an individual is guilty of resisting or obstructing an officer by flight only if he flees while knowing of the officer's intent to detain him and if the officer is justified in detaining the individual before he flees." Id. at 1130 (second emphasis added). In J.D.H., the juvenile defendant fled from the police, who were conducting a trespass investigation at a basketball court in a public housing project late in the evening. Id. at 1129-30. The defendant initially ignored the officers' verbal commands to stop; when the defendant finally stopped, the officers arrested him and found cocaine on his person. Id. at 1130.

At issue in J.D.H. was whether contraband found in the search should have been suppressed because the arrest was unlawful. Id. at 1129. The arresting officer testified that the defendant was arrested for not obeying the police order to stop, which was issued after he initially fled from the police. Id. at 1130. To resolve the issue, the Second District concluded that "because [the defendant] fled from officers who had no legal right to detain him, he could not have been lawfully arrested for resisting an officer without violence." Id. Notably, the Second District rejected the State's argument that the defendant's flight created both the reasonable suspicion to stop him under Wardlow and the probable cause to arrest him for resisting an officer without violence because it "would improperly criminalize the simple act of fleeing from an officer and expand the holding of Wardlow beyond its plain language." Id. at 1132.
[8] Although D.T.B. was charged with resisting arrest without violence, a violation of section 843.02 is not limited to resisting arrest, but rather expansively criminalizes resistance of an officer who is in the performance of a lawful duty without violence. See, e.g., Tillman, 934 So.2d at 1269 (explaining that the crime of resisting an officer with violence "has sometimes been described inaccurately as `resisting arrest with violence'" and noting that "neither the title of the statute ... nor its explicit terms limit it to arrest scenarios") (emphasis added).
[9] See, e.g., Tillman v. State, 934 So.2d 1263, 1270 (Fla.2006) ("[I]t is not this Court's function to substitute its judgment for that of the Legislature as to the wisdom or policy of a particular statute." (quoting State v. Rife, 789 So.2d 288, 292 (Fla.2001))).
[10] For example, in D.T.B., it appears the juvenile's motivation for flight was entirely innocent. In that case, the juvenile's sole offense was the obstruction charge. Conversely, in C.E.L., in addition to the obstruction charge, the juvenile also had an outstanding warrant.
[11] A challenge such as this was raised in C.H.C. v. State, 988 So.2d 1145 (Fla. 2d DCA 2008). There, a deputy attempted to detain a juvenile who was walking in a circle, clenching his fists, and yelling profanities. The Second District held that the behavior was not sufficient to create reasonable suspicion of criminal activity and, thus, the juvenile's flight could not support a charge of obstructing or opposing an officer. Id. at 1147. C.H.C. is factually distinguishable from C.E.L. In C.H.C., there was no evidence that the officer had the founded suspicion to justify the detention, and therefore, as the court in C.H.C. notes, the flight in that case occurred after an unlawful order to stop and not prior to a lawful order as in Wardlow Id.
[12] In fact, "the Supreme Court left the question open in Wardlow, basing its holding on an assumed but undefined factual issue." Andrew Guthrie Ferguson & Damien Bernache, The "High-Crime Area" Question: Requiring Verifiable and Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis, 57 Am. U.L.Rev. 1587, 1622-23 (2008).
[13] We have only to look at any information concerning the relationship of the police with citizens who live in these so-called "high crime areas" to know that the residents of many of these areas are poor or minority or both and that they have a distrust of the police. Often this distrust is based on their personal encounters with the police or their observations of police actions and conduct that may not have even involved them.