PER CURIAM:
Amanda Jessup appeals from an adverse summary judgment on her state law false arrest claim against the City of South Miami alleging that she was arrested without probable cause. She also appeals from an adverse summary judgment on her 42 U.S.C. § 1983 claims against City of South Miami Police Officers Maximilian Valdes and Darby Wagner alleging that her arrest also violated her Fourth and Fourteenth Amendment rights. Finally, she appeals from an adverse summary judgment on her § 1983 claims against Miami-Dade County and its law enforcement officer, Katrina Robinson, alleging that they violated her Fourteenth Amendment due process rights by being deliberately indifferent to her serious medical and psychiatric needs. We affirm summary judgment in favor of Miami-Dade County and Robinson.[1] However, we find that genuine dis *691 putes of material facts preclude summary judgment on Jessup’s remaining claims against the City of South Miami, Officer Valdes, and Officer Wagner.
The evidence in this case is hardly a model of clarity. Almost everything is disputed. However, as we are reviewing the district court’s grant of summary judgment, we must view the evidence and draw inferences in the light most favorable to the non-moving party, Jessup, in order to determine whether there exists a “genuine dispute as to any material fact.” Fed. R.Civ.P. 56(a). A genuine dispute of material fact exists, and summary judgment is inappropriate, when “there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.” Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir.1995).
Viewed in the light most favorable to Jessup, the evidence shows the following. Officer Valdes was dispatched to a private residence at 2:45 a.m. to investigate a complaint that a basketball had been stolen. That evening, Jessup had been visiting her boyfriend, Karl Casebeer, at his house, which was located down the street from where the basketball had been reported stolen. When Officer Valdes passed Case-beer’s house, Jessup and Casebeer had gone outside and were talking in the gated side yard of Casebeer’s house. When Officer Valdes saw them, he stopped his patrol car, drew his gun, yelled “Let me see your hands, step out,” and ordered them both to the ground when they stepped outside the gate onto the sidewalk. Together with Officer Wagner, who had arrived as backup, Officer Valdes patted down Jessup and Casebeer.
After finding no weapons, Jessup and Casebeer were permitted to stand, and Officer Valdes told Jessup to step away while he questioned Casebeer about the missing basketball. At that point, Officer Valdes saw a basketball in Casebeer’s front yard, and asked Casebeer if he had stolen it; Casebeer answered that his father had given the basketball to him for Christmas and that he had not stolen it. Officer Valdes then placed handcuffs on Casebeer and “got right in [his] face, called [him] a liar and a thief,” and “cussed at” him. Officer Valdes was “yelling at [Casebeer]” from such close range that Casebeer “could feel [Officer Valdes’s] spit on [his] face.” During this exchange, Jess-up remained standing next to Casebeer and Officer Valdes and interjected that the basketball belonged to Casebeer and that “this is ridiculous.”
Officer Wagner “looked kind of shocked” at Officer Valdes’s actions, and decided to check with the neighbor who had called in the theft to determine whether the basketball on Casebeer’s lawn belonged to her. By this time, Casebeer’s stepbrother, Joseph Crockett, had woken up Casebeer’s father, and both had come outside. Case-beer’s father told the officers that the basketball in the yard belonged to Casebeer and that he had given it to him for Christmas. The officers then asked the neighbor, who had been brought to Casebeer’s house, to get her son and find out if he knew where his basketball was. The neighbor left and shortly thereafter returned with her son, who had his basketball with him, thus confirming Casebeer’s story that he had not stolen his neighbor’s ball, and that the ball on his lawn was his.
However, even after the neighbor’s son returned with his own basketball, Officer Valdes continued to accuse Casebeer of *692 lying and of having gone into the neighbor’s yard. At this point, Jessup, who had been standing off to the side and occasionally interjecting that she thought “this [was] nonsense” or “bullshit” because she and Casebeer “hadn’t done anything,” raised her voice and began “getting louder.” Jessup was, in Crockett’s words,
[j]ust kind of protesting over and over, because she felt like it was — I don’t know. It seemed like she felt it was ridiculous that it had gotten to this point and hadn’t been resolved simply when they asked him, and then found out that the lady was wrong about, you know, what basketball they had and whatnot.
The officer told Jessup to be quiet, and that if she said another word, he was going to arrest her. Jessup then said one word, “ridiculous,” with a sigh, and Officer Valdes arrested her for obstructing justice in violation of § 843.02, Florida Statutes, handcuffed her, and put her in the back of the police car.[2] Jessup was then transported to jail, where she became psychotic and suicidal.
Jessup makes two separate claims with reference to her assertion that Officers Valdes and Wagner lacked probable cause to arrest her for obstruction of justice: a federal 42 U.S.C. § 1983 claim and a state law false arrest claim. In her 42 U.S.C. § 1983 claims against Officers Valdes and Wagner, she alleges that the arrest violated her federal constitutional rights to be free from unreasonable searches and seizures.[3] In response to these § 1983 claims, Officers Valdes and Wagner raise the defense of qualified immunity, to which they are entitled if they had “arguable probable cause” to arrest Jessup. Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir.2002).
Jessup’s second claim is a state law false arrest claim against the City of South Miami, based on the actions of Officers Valdes *693 and Wagner.[4] Under Florida law, a city is liable for a false arrest claim based upon the actions of its officers. Maybin v. Thompson, 514 So.2d 1129, 1131 (Fla.Dist.Ct.App.1987) (citing Richardson v. City of Pompano Beach, 511 So.2d 1121 (Fla.Dist.Ct.App.1987)). A city may not rely on the defense of sovereign or qualified immunity under Florida law. See Lester v. City of Tavares, 603 So.2d 18, 19 (Fla.Dist.Ct.App.1992) (per curiam); Maybin, 514 So.2d at 1131. Thus, the question with respect to Jessup’s state law claim against the city is whether the officers had probable cause to arrest her for obstruction of justice.
To constitute obstruction of justice, under § 843.02, Florida Statutes, the officer must have been engaged in “[1] the lawful execution [2] of a legal duty; and [3] the defendant’s action, by his words, conduct, or a combination thereof, [must have] constituted obstruction or resistance of that lawful duty.” CEL v. State, 24 So.3d 1181, 1185-86 (Fla.2009) (per curiam). There is no question that Officers Valdes and Wagner had a legal duty to investigate the theft of a basketball. The question here, however, is whether the manner in which they were executing that duty was lawful. If the Terry[5] stop of Jessup and Casebeer was unlawful or became unlawful at any point before Jessup’s resistance occurred, then the first element of § 843.02 was not satisfied, and the officers were not engaged in the lawful execution of their duty to investigate.
Under Florida law, “[i]n determining whether an officer was engaged in the lawful execution of a legal duty, we must apply the legal standards governing the officer’s duty at the point that the resistance occurs. In cases involving an investigatory detention, it is necessary for the State to prove that the officer had a reasonable suspicion of criminal activity that would support the detention.” Davis v. State, 973 So.2d 1277, 1279 (Fla.Dist.Ct.App.2008) (citation omitted). Applying this principle, in C.H.C. v. State, 988 So.2d 1145 (Fla.Dist.Ct.App.2008), the court held that the defendant’s actions in fleeing from an officer after the officer had directed him to stop did not constitute obstruction of justice under § 843.02 because the officer did not have the requisite reasonable suspicion to conduct a Terry stop, and thus his execution of his legal duties was not lawful. Id. at 1146-47. Likewise, in M.R. v. State, 34 So.3d 143 (Fla.Dist.Ct.App.2010), the court held that the defendant did not violate § 843.02 when she resisted an officer because the officer was not lawfully executing his legal duty when he detained the defendant without reasonable suspicion. Id. at 144-45.
After careful review, we conclude that, viewing the disputed facts in the light most favorable to Jessup, there is suffi *694 cient evidence based upon which a reasonable jury could decide that the officers were not engaged in a lawful Terry stop at the time Jessup was arrested. Even if we assume that the officers initially had reasonable suspicion to stop Jessup and Case-beer, once they learned that no basketball had actually been stolen, there was no further basis for suspecting any criminal activity and, thus, no lawful reason to continue any detention. Jessup presented sufficient evidence from which a reasonable jury could find that the officers learned of this material fact before they arrested Jessup. If they did, then any Terry stop should have ceased at that point. Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (making clear that “an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop”); Croom v. Balkwill, 645 F.3d 1240, 1251 n. 15 (11th Cir.2011) (per curiam) (noting that Terry investigative stops must “cease once law enforcement’s reasonable, articulable suspicions of [detainee are] allayed”); see also United States v. Watts, 7 F.3d 122, 126 (8th Cir.1993) (“[A]n investigative stop must cease once reasonable suspicion or probable cause dissipates.”). Here, the officers continued to detain and question Jessup and Casebeer. Prolonging the Terry stop after learning that no theft had occurred was unlawful, and the officers had no reasonable basis for believing otherwise. Thus, “the facts and circumstances [were not] sufficient to warrant a prudent man in believing that” the first element of § 843.02 was satisfied — i.e., that they were lawfully executing a legal duty. See Gerstein v. Pugh, 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (internal quotation mark omitted). Because a reasonable jury could find that the officers lacked probable cause to arrest Jessup for violating § 843.02, Jessup is entitled to have a jury resolve the disputed issues of fact that remain in this case, and the district court erred in granting the City of South Miami summary judgment on Jessup’s state law false arrest claim.
For the same reasons, the district court erred in granting summary judgment to Officers Valdes and Wagner on Jessup’s 42 U.S.C. § 1983 claims. “It is clearly established that an arrest made without probable cause violates the Fourth Amendment.” Redd v. City of Enterprise, 140 F.3d 1378, 1382 (11th Cir.1998). Given that, under the facts viewed in the light most favorable to Jessup, the officers had absolutely no basis for prolonging the Terry stop once they learned that no basketball had been stolen, it is not “arguable” that they possessed probable cause to believe that the first element of § 843.02 had been satisfied, and thus they lacked “arguable probable cause” to arrest Jessup and were not entitled to qualified immunity.
For the foregoing reasons, we reverse summary judgment as to Jessup’s state law false arrest claim against the City of South Miami; reverse summary judgment as to Jessup’s 42 U.S.C § 1983 claims against Officers Valdes and Wagner; and affirm summary judgment as to Jessup’s 42 U.S.C. § 1983 claims against Miami-Dade County and Officer Robinson.
AFFIRMED, IN PART; REVERSED AND REMANDED, IN PART.

. Jessup argues that the district court erred in refusing to consider at summary judgment certain evidence, which, if considered, would have created a disputed issue of material fact regarding her deliberate indifference claim. The evidence was the declaration of a third-party who transcribed a witness's oral statements made in a sworn video statement and who attested that the transcription was true and accurate. However, the declaration is not the witness’s sworn statement to a court reporter, but is a transcription by a person of unknown qualifications of the witness's prior sworn statement that was made under unknown conditions and in the presence of un *691 known persons. Jessup simply has not shown how the transcriber’s declaration is as reliable as the witness's signed affidavit or as the witness's deposition. Accordingly, the district court did not abuse its discretion in refusing to consider this evidence.

. The record establishing this time-line is anything but clear, but we emphasize again that at this stage we are required to view the record in the light most favorable to Jessup, making all reasonable inferences and credibility determinations in her favor. See Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir.2000).
Here, the deposition testimony is deeply conflicted on the dispositive question: whether Casebeer's neighbor and her son returned from their house with their ball or otherwise informed the officers of their mistake before Officer Valdes arrested Jessup. The neighbor’s recollection of the nature of the inquiry differed from that of both the officers and the residents of the Casebeer house, but she claimed to have "left the scene” as the situation "was getting heated” but before any arrest was made. Officer Valdes, by contrast, testified that Jessup had been so hostile to questioning that they were unable to learn anything at all about the facts because she kept interrupting. Officer Valdes specifically testified that he had not even ascertained that Casebeer lived in the house at the time of Jessup's arrest. Officer Wagner, meanwhile, testified that Casebeer had said, not that the basketball was his, but that he had found it. Further, contrary to the testimony of Case-beer and his stepbrother, Officer Wagner testified that he took the basketball back to the neighbor and her son, who then confirmed that the basketball found on the Casebeers’ lawn was theirs. In fact, Officer Wagner testified, the only reason that he did not arrest Casebeer for theft was that the neighbor "refused to press charges.” In sum, the testimony on when the officers learned that the basketball had not been stolen — or even whether it was — is thoroughly in dispute. But reading these conflicting stories in the light most favorable to Jessup, we must accept that the neighbor and her son had at least informed the officers that they had found their ball. The officers were thus aware that neither Casebeer nor Jessup nor anyone else had stolen it.

. A warrantless arrest violates the Fourth Amendment if it is made without probable cause. Henry v. United States, 361 U.S. 98, 101-03, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

. In Florida, the tort of false arrest "is defined as ‘the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and the deprivation of his liberty.’ ” Escambia Cnty. Sch. Bd. v. Bragg, 680 So.2d 571, 572 (Fla.Dist.Ct.App.1996) (per curiam) (quoting Johnson v. Weiner, 155 Fla. 169, 19 So.2d 699, 700 (1944)).

. Under Terry v. Ohio, a police officer may stop, detain, and briefly question a citizen if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.” 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Reasonable suspicion must be more than an "inchoate and unpar-ticularized suspicion or ‘hunch.’ " Id. at 27, 88 S.Ct. 1868. "[T]he detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.” United States v. Cortez, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). No one disputes that the officers' detention of Jessup and Casebeer constituted a Terry stop.